**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ELZA EVANS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:17-cv-01242** |
| | ) | |
| **CHERRY LINDAMOOD, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

Elza Evans is currently serving an effective sentence of life in prison without the possibility of parole, based on his November 4, 2010 conviction by a Davidson County, Tennessee jury of one count of aggravated burglary, two counts of especially aggravated kidnapping, and one count of aggravated robbery. On September 8, 2017, he filed his pro se petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) Respondent thereafter filed her answer to the petition (Doc. No. 8) and the state court record (Doc. No. 7), and Petitioner filed a reply to Respondent's answer (Doc. No. 9).

This matter is ripe for the Court's review, and the Court has jurisdiction. Respondent does not dispute that Petitioner's petition is timely, that this is his first § 2254 petition related to these convictions, and that the claims of the petition have been exhausted. (Doc. No. 8 at 1–2.)

Having reviewed Petitioner's arguments and the underlying record, the Court finds that an evidentiary hearing is not required. As explained below, Petitioner is not entitled to relief under § 2254, and his petition will therefore be denied.

## I.    Procedural History

Petitioner and three co-defendants were indicted on June 5, 2009, on one count of aggravated burglary, two counts of especially aggravated kidnapping, and one count of aggravated robbery. (Doc. No. 7-1 at 4–9.) Petitioner moved for a severance from his co-defendants for purposes of trial, but the trial court denied the motion to sever and set the matter for jury trial of all defendants. (Id. at 47.) On November 4, 2010, the jury found Petitioner guilty as charged in the indictment. (Id. at 77.) At his February 4, 2011 sentencing, Petitioner was found to be a persistent offender with multiple prior convictions, and a repeat violent offender based on a previous second-degree murder conviction. (Id. at 86). Consecutive sentences of life imprisonment without the possibility of parole were therefore imposed for his two especially aggravated kidnapping convictions. (Id. at 87–88.) The trial court also imposed a sentence of fourteen years for the aggravated burglary conviction and a sentence of twenty-six years for the aggravated robbery conviction, both to be served concurrently with the life sentences for especially aggravated kidnapping. (Id. at 87–88, 89–93.)

On direct appeal, Petitioner argued that: (1) the trial court erred by denying his motion to sever; (2) the evidence was insufficient to support his convictions; and (3) the trial court erred in its sentencing determinations for aggravated burglary and aggravated robbery. State v. Mathis, No. M2011-01096-CCA-R3-CD, 2013 WL 4774130, at *1 (Tenn. Crim. App. Sept. 5, 2013), perm. app. denied (Tenn. Dec. 12, 2013). The Tennessee Court of Criminal Appeals concluded that Petitioner failed to prepare an adequate record on appeal to resolve the severance issue because he did not include a transcript of the severance hearing, but nonetheless found that the trial court's denial of the severance was not an abuse of discretion. Id. at *7. The court further concluded that the evidence was legally sufficient to support the convictions and that Petitioner's sentences were

properly imposed. Id. at *11, 15. The Tennessee Supreme Court denied discretionary review through an order entered on December 12, 2013. (Doc. No. 7-16.)

Petitioner subsequently filed a pro se petition for post-conviction relief on December 11, 2014. (Doc. No. 7-17 at 36–44.) Following an evidentiary hearing, the post-conviction court denied relief. (Id. at 81–84.) On appeal, the Tennessee Court of Criminal Appeals affirmed the denial of the post-conviction petition. Evans v. State, No. M2016-02332-CCA-R3-PC, 2017 WL 3600474, at *1 (Tenn. Crim. App. Aug. 21, 2017). The Tennessee Supreme Court denied Petitioner's application for permission to appeal on October 4, 2017. (Doc. No. 7-26.) While that application was pending, Petitioner filed his pro se petition in this Court on September 8, 2017. (Doc. No. 1.)

## II.    Statement of Facts

### A.    Evidence at Trial

The facts adduced at Petitioner's trial were summarized by the Tennessee Court of Criminal Appeals in State v. Mathis, No. M2011-01096-CCA-R3CD, 2013 WL 4774130, at *1–5 (Tenn. Crim. App. Sept. 5, 2013). The court first described the trial testimony of the victims, Terry Becker and Lisa Lewis, who in 2009 were engaged to be married and were renting a two-bedroom house together. Becker testified that Petitioner's co-defendants, Emily Turner and Danny Lee Sams, visited the house on the night of February 25, 2009. He testified that Turner was friends with Lewis, that Turner and Sams had visited the house in the past, and that Turner had spent the night in the guest bedroom on occasion. Becker further testified that he had previously loaned money to Turner and Sams and had helped Sams secure various odd jobs. Id. at *1.

Becker testified that, during the visit at his home with Turner and Sams on February 25, 2009, the couple (Turner and Sams) got into an argument, as a result of which Sams stormed out

of the house and drove away in Turner's car, leaving her stranded. Although Becker offered to help Turner retrieve her car, Turner decided not to pursue the matter but to stay the night in Becker and Lewis's guest bedroom. Id.

The events of the following morning, February 26, 2009, were described in Terry Becker's testimony, and summarized by the Tennessee Court of Criminal Appeals, as follows:

> The next morning, Mr. Becker awoke at approximately 7:45 a.m. Mr. Becker testified that he saw Turner standing in the doorway of the guest bedroom. Mr. Becker asked Turner if she had let the dogs out, and she replied that she was about to. Mr. Becker then went to his kitchen to make some coffee. As Mr. Becker was making his coffee he saw two African-American men standing in his living room. Both men were dressed in "dark colored" clothes, had bandanas over their faces, wore sunglasses, and had plastic gloves on their hands. Both men were also wearing baseball caps and had the hoods from their sweatshirts up. Both men had guns and pointed them at Mr. Becker.

> Mr. Becker testified that one of the men told him to get "all of the way down" on the ground. Mr. Becker complied, and the men duct taped his hands behind his back. The men then moved Mr. Becker to a dining room chair where they "strapped [him] to the chair around [his] chest and [his] upper arms" with duct tape. The men also taped Mr. Becker's arms to the chair. After Mr. Becker was taped to the chair, one of the men brought co-defendant Turner into the room and had her lie down on the floor. Mr. Becker testified that one of the men then went into the bedroom, woke Ms. Lewis up, brought her into the dining room, and had her lie down next to Turner. According to Mr. Becker, one of the men said, "Lisa we've been looking for you for a long time." The man said that Ms. Lewis "owed them $18,000." The man also nudged Turner with his foot several times and repeatedly said, "We don't know who this b——h is," to the point that Mr. Becker thought that they were overemphasizing it.

> The men made Ms. Lewis kneel down in front of Mr. Becker, and one of them asked Ms. Lewis if she loved Mr. Becker. When Ms. Lewis stated that she did, the man said that Mr. Becker would write two checks for $9,000, one made out to Ms. Lewis and one made out to co-defendant Turner, and that the women would cash the checks and return with the money in thirty minutes or they would kill Mr. Becker. While the man was explaining the plan he had a gun pointed at Ms. Lewis, and the other man pointed his gun at Mr. Becker. One of the men got Mr. Becker's checkbook and brought it back to the dining room. The men freed one of Mr. Becker's hands, and Mr. Becker wrote the checks as instructed. Sometime after the women left, the branch manager from a nearby Regions Bank called Mr. Becker. Mr. Becker testified one of the men put a gun to his head and leaned in so he could overhear the conversation. The branch manager told Mr. Becker that he was calling

4

to verify that he had written the checks, and Mr. Becker told the branch manager to cash the checks.

A short time after the phone call from the bank manager, one of the men left the room to answer a cell phone call. When the man came back into the room he said that the police were at the bank, that they needed to leave, and told the other man to "take care" of Mr. Becker. The other man gagged Mr. Becker and bound him with more duct tape. The men broke Mr. Becker's cell phone, took the battery out of his home phone, and then fled the house. After they left, Mr. Becker was able to free himself. Mr. Becker testified that the skin on his arms was torn and bleeding from the duct tape. Mr. Becker also testified that at least one of the men stayed with him at all times during the ordeal and that the men kept their guns out the entire time they were there. Mr. Becker recalled that one of the men did most of the talking and that the other man stayed with him the majority of the time. Mr. Becker later inspected the house and found no evidence of forced entry.

Mathis, 2013 WL 4774130, at *1–2.

Lisa Lewis testified consistently with Becker concerning the circumstances of their visit from Turner and Sams, adding that she and Turner had used drugs the night of February 25, 2009. She further confirmed Becker's testimony about the events of the following morning, adding that before she and Turner left to cash the checks written by Becker, she witnessed one of the masked men stealing $300.00 in cash and a debit card out of a bedroom nightstand. Id. at *2–3. Lewis's testimony concerning the events that transpired after she and Turner left the house on February 26 was summarized by the Tennessee Court of Criminal Appeals, as follows:

Ms. Lewis testified that co-defendant Turner drove to the bank. According to Ms. Lewis, Turner repeatedly said that she wanted to stop somewhere and call co-defendant Sams. At some point while they were driving to the bank, Turner told Ms. Lewis, "[T]hey know you're wanted, they don't think you'll call the police." Ms. Lewis testified that when they arrived at the bank she "came unglued" and explained to a bank employee what was happening. The employee had Ms. Lewis call the police on his cell phone while the bank manager called Mr. Becker to "buy him a little bit of time." Ms. Lewis recalled that Turner continued to talk about how she needed to call Sams. The bank employees who helped Ms. Lewis testified at trial that she was "hysterical" while Turner was "real calm" and "distant." While they were at the bank, Turner pulled out her cell phone and made a phone call. Turner told the person she called that she was not at Mr. Becker's house, that she was at the bank, and whoever was going to pick her up should not go to Mr. Becker's house.

> Ms. Lewis admitted that when she called the police and initially spoke with the responding officers she used a fake name. Ms. Lewis explained that, at the time, she had a drug problem and an outstanding warrant for a probation violation. Ms. Lewis testified that she was afraid of being arrested by the police. Ms. Lewis was arrested later that day after the police had completed their investigation into the robbery. Ms. Lewis testified that she gave the check made out to her to the police when they arrived. However, the police could not locate the check made out to co-defendant Turner. The bank employee who assisted Ms. Lewis testified that he had seen two checks both made out for $9,000 when the women arrived at the bank. Turner told the police that she had given the check to Ms. Lewis, but Ms. Lewis testified that she did not remember Turner ever giving her the check. The detective who responded to the bank testified that Turner told him her check "must've gotten blown away in the wind."

Mathis, 2013 WL 4774130, at *3. Turner and Sams were subsequently arrested while attempting

to pass a check from Becker's checkbook. Id. at *4.

The Tennessee Court of Criminal Appeals further summarized the evidence concerning the

scene of the crime and its planning, as follows:

> Based upon Ms. Lewis's 911 call, officers from the Metropolitan Nashville Police Department surrounded Mr. Becker's house. Officers observed two men dressed in "all black, dark clothing" exit the house and begin hurriedly walking away from the house. When an officer approached the men they began running in opposite directions. Officers subdued both men. Defendants Mathis and Evans were identified at trial as the two men caught fleeing from Mr. Becker's house. Officers saw the Defendants "dropping stuff" as they ran and collected trails of evidence from each of the Defendants leading back toward Mr. Becker's house.
>
> On the ground where Defendant Evans had been running, police found a wig, a black baseball cap, a cigarette lighter, a cell phone, and a .380 caliber pistol. Defendant Evans had "long black" wig hairs on his neck and head. A search of Defendant Evans revealed a roll of duct tape, a black bandanna, and a cell phone. On the ground where Defendant Mathis had been running, police found a cell phone, a black baseball cap, a wig, a pair of sunglasses, three plastic gloves, and Mr. Becker's debit card. An officer saw Defendant Mathis throw a gun over a fence into a neighbor's yard and a .9mm pistol was later recovered from the neighbor's yard. Both of the recovered guns were fully loaded and ready to fire. When Defendant Mathis was stopped, he had on plastic gloves with pieces of duct tape stuck to them and a hairnet for a wig on his head. A search of Defendant Mathis revealed a bandanna, the key to a Jeep Cherokee, and $341 in cash.

A Jeep Cherokee was found a block away from Mr. Becker's house. Fingerprints belonging to Defendant Mathis and co-defendant Turner were found on the outside of the vehicle. Inside the vehicle was a receipt for the purchase of two pairs of sunglasses, two bandanas, and a "hoodie," timestamped at 3:09 a.m. on February 26, 2009. . . .

Co-defendant Sams testified that he had pled guilty in this case and was awaiting sentencing. Sams testified that at the time of the robbery he was dating co-defendant Turner. According to Sams, Turner came up with the idea to rob Mr. Becker, and he helped her plan the robbery. Sams testified that Turner introduced him to Defendant Mathis and that they approached him about helping them with the robbery because they knew he had a gun. Defendant Mathis agreed to help them, but he said "that he wanted to do it his way; that he had a friend from his hometown that he could trust." They agreed that they would force Mr. Becker to write two checks totaling $18,000 and that they would split the money three ways: Sams and Turner would get $6,000; Defendant Mathis would get $6,000; and Defendant Mathis's "partner" would get $6,000.

Co-defendant Sams testified that the plan was for co-defendant Turner to stay the night at Mr. Becker's house and leave the backdoor unlocked. Sams also testified that he drove by Mr. Becker's house with Defendant Mathis so he could get an idea of how he would enter the house. According to Sams, on the night of February 25, 2009, he pretended to have an argument with Turner so she could stay the night at Mr. Becker's house. Sams testified that Turner later called him and told him that Mr. Becker and Ms. Lewis had believed them. The next day Turner called him from the bank to tell him that the police were on their way and not to go to Mr. Becker's house. Sams testified that he called Defendant Mathis and told him to get out of the house because the police were on their way. Sams claimed that he did not know Defendant Evans and that Defendant Evans was not involved in the planning of the robbery.

Mathis, 2013 WL 4774130, at *4–5.

The jury convicted Petitioner and his co-defendants of all charged offenses. In sentencing Petitioner, the trial court noted that he had prior convictions for second degree murder, facilitation of attempted first degree murder, especially aggravated robbery, aggravated robbery, and burglary. Id. at *6. Accordingly, the court found that Petitioner was a dangerous, repeat violent offender and gave him "an effective sentence of two lifetimes without the possibility of parole." Id.

### B.    Post-Conviction Testimony

Petitioner testified at an evidentiary hearing before the state post-conviction trial court, where testimony was also given by Mr. Mathis and Ms. Turner, as well as by counsel for Petitioner and counsel for Mr. Mathis. The Tennessee Court of Criminal Appeals summarized this testimony in Evans v. State, No. M2016-02332-CCA-R3-PC, 2017 WL 3600474, at *1–9 (Tenn. Crim. App. Aug. 21, 2017), app. denied (Tenn. Oct. 4, 2017).

Mathis testified that "when the offenses occurred, the Petitioner did not know what was happening and did not have a weapon," and that Mathis "forced the Petitioner to commit the home invasion." Id. at *1. Mathis stated that he wanted to testify on Petitioner's behalf at trial, but that his lawyer convinced him not to testify based on the likelihood that the State would question him about his prior convictions if he took the stand. Id. He testified that he had known Petitioner since the age of fifteen, and that they remained friends. Id. at *2.

Mathis testified that he planned the offenses with Turner and Sams, neither of whom knew Petitioner. He maintained that the evening before these offenses were committed, when Petitioner arrived in Nashville to celebrate his birthday with Mathis, Petitioner was not informed of the planned home invasion. Mathis testified that he had the duct tape, masks, and wigs at his house the evening before the home invasion but could not recall whether he had purchased these items prior to Petitioner's arrival. Mathis testified that he spent that evening drinking alcohol with Petitioner. His testimony as to the events of the following day was summarized by the Tennessee Court of Criminal Appeals, as follows:

> The following day, Mr. Mathis drove his neighbor's vehicle and parked down the street from Mr. Becker's home, and he and the Petitioner walked to Mr. Becker's home. Mr. Mathis had a bag of items with him. Mr. Mathis said that he jumped over a fence in Mr. Becker's backyard and that the Petitioner followed him. Mr. Mathis testified that he had two guns on his person. He stated that once they reached Mr. Becker's door, he told the Petitioner of the plan and instructed the Petitioner to

"follow his lead" although the Petitioner said he did not wish to participate. Mr. Mathis said he produced a gun, "kind of forced it on" the Petitioner, and made the Petitioner put on a wig. Mr. Mathis denied giving the Petitioner a gun and maintained that he forced the Petitioner to participate in the home invasion. When the State questioned Mr. Mathis about the details of the events, he responded, "[Y]ou're trying [to] get me to go into specific ... detail. I can't do all of that." Mr. Mathis maintained that although he had two guns on his person, he produced only one gun during the home invasion. He stated that Mr. Becker's testimony that the perpetrators both had guns was incorrect. . . . Mr. Mathis initially testified that the Petitioner voluntarily entered the home but then stated that "it was forced" and that the Petitioner did not want to be involved in the offenses. Mr. Mathis did not recall what he said to the Petitioner to make him enter the home. Mr. Mathis later testified that he pointed a gun at the Petitioner and instructed him to "follow [his] lead."

Evans, 2017 WL 3600474, at *2.

In describing Petitioner's testimony at his post-conviction hearing, the Tennessee Court of Criminal Appeals noted Petitioner's statement "that he asked trial counsel to file a motion to sever his trial from the trials of his co-defendants because Mr. Mathis and Mr. Sams were willing to testify on his behalf at trial." Id. at *3. Petitioner testified that "the majority of the evidence implicated his co-defendants and that he was merely present when the offenses occurred," but that his motion to sever was denied as untimely. Id. He further "recalled that trial counsel mentioned that the case would be his first jury trial but assured the Petitioner that he would adequately represent him." Id. Petitioner nonetheless requested that trial counsel withdraw and although a motion to withdraw was filed, it was denied as untimely. Id.

The Court of Criminal Appeals further summarized Petitioner's post-conviction hearing testimony as follows:

The Petitioner denied participating in the commission of the offenses and stated that while inside the house, he was scared and did not feel free to leave. He and Mr. Mathis remained inside the house for approximately forty-five minutes, and the Petitioner never yelled for help or asked Mr. Mathis to stop. After Mr. Mathis received a call instructing him to leave, the Petitioner retrieved a bag that Mr. Mathis had brought into the house and left the house before Mr. Mathis. The Petitioner and Mr. Mathis fled upon seeing police officers. The Petitioner did not inform officers that he was forced inside the house. He acknowledged that he told

the officers that as he was fleeing, he threw down a gun, a bandanna, and a wig. He said that he initially denied possessing a gun but that after the officers continued "badgering" him, he told them "in [j]est" that he discarded the gun while fleeing.

The Petitioner testified that both before and during trial, he and trial counsel discussed whether the Petitioner should testify. Trial counsel advised him against testifying because the State would question him about his prior criminal record. The Petitioner acknowledged that he had prior convictions for second degree murder, facilitation of attempted first degree murder, especially aggravated robbery, unlawful possession of a weapon, and third degree burglary.

Evans, 2017 WL 3600474, at *3–5.

Mathis's trial counsel testified at Petitioner's post-conviction hearing that he believed the State had a strong case against Mathis, and that "while he strongly discouraged Mr. Mathis from testifying at trial, it was ultimately Mr. Mathis's decision to not testify." Id. at *5. Petitioner's trial counsel "recalled that the basis for the motion to sever the trials was that trial counsel wanted to call Mr. Mathis as a witness to testify on the Petitioner's behalf." Id. at *8. He testified that "had his motion to sever the Petitioner's trial been granted or had Mr. Mathis testified during the trial, trial counsel would have pursued a theory of defense that the Petitioner was not involved in the commission of the offenses," but "because the motion to sever was denied and Mr. Mathis did not testify at trial, the defense theory was that the Petitioner was merely a facilitator rather than a primary actor." Id.

## III.     Issues Presented for Review

Petitioner's pro se petition in this Court raises the following claims:

    (1)    The trial court erred when it denied Petitioner's motion for severance;

    (2)    The verdict was against the weight of the evidence;

    (3)    He was unlawfully sentenced when the trial court applied an improper enhancement factor, placed undue weight on the remaining enhancement factor, and concluded there were no mitigating factors; and

(4)     The trial court erred by denying trial counsel's pretrial motion to withdraw.

(Doc. No. 1 at 4–8.)

## IV.     Legal Standard

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Peterson v. Warren, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" Woodford v. Garceau, 538 U.S. 202, 206 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." Uttecht v. Brown, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington v. Richter, 562 U.S. 86, 102–03 (2011) (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979)). Where state courts have ruled on a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state

court's determination was incorrect. <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007) (citing <u>Williams v. Taylor</u>, 529 U.S. 362, 410 (2000)).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (d)(2). A state court's legal decision is "contrary to" clearly established federal law under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. at 412–13. An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> at 413. A state court decision is not unreasonable under this standard simply because the federal court finds it erroneous or incorrect. <u>Id.</u> at 411. Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. <u>Id.</u> at 410–12.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under § 2254(d)(2) simply because it disagrees with the determination; rather, the determination must be "'objectively unreasonable' in light of the evidence presented in the state court proceedings." <u>Young v. Hofbauer</u>, 52 F. App'x 234, 236 (6th Cir. 2002). "A state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record."

Matthews v. Ishee, 486 F.3d 883, 889 (6th Cir. 2007) (quoting § 2254(d)(2) and (e)(1)); but see McMullan v. Booker, 761 F.3d 662, 670 & n.3 (6th Cir. 2014) (observing that the Supreme Court has not clarified the relationship between (d)(2) and (e)(1) and the panel did not read Matthews to take a clear position on a circuit split about whether clear and convincing rebutting evidence is required for a petitioner to survive (d)(2)). Moreover, under § 2254(d)(2), "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." Rice v. White, 660 F.3d 242, 250 (6th Cir. 2011).

The standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (quoting Richter, 562 U.S. at 102, and Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam)). Petitioner bears the burden of proof. Pinholster, 563 U.S. at 181.

Even that demanding review, however, is ordinarily only available to state inmates who have fully exhausted their remedies in the state court system. 28 U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has presented the same claim sought to be redressed in a federal habeas court to the state courts. Cullen v. Pinholster, 563 U.S. at 182; Kelly v. Lazaroff, 846 F.3d 819, 828 (6th Cir. 2017) (quoting Wagner v. Smith, 581 F.3d 410, 417 (6th Cir. 2009)) (petitioner must present the "same claim under the same theory" to the state court). This rule has been interpreted by the Supreme Court as one of total exhaustion, Rose v. Lundy, 455 U.S. 509 (1982), meaning that each and every claim set forth in the federal habeas corpus petition must have been

presented to the state appellate court. Picard v. Connor, 404 U.S. 270 (1971); see also Pillette v. Foltz, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). Moreover, the substance of the claim must have been presented as a federal constitutional claim. Gray v. Netherland, 518 U.S. 152, 162–63 (1996).

The procedural default doctrine is ancillary to the exhaustion requirement. See Edwards v. Carpenter, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. Wainwright v. Sykes, 433 U.S. 72, 81–82 (1977); see also Walker v. Martin, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment"); Coleman v. Thompson, 501 U.S. 722 (1991) (same). If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), then the claim is technically exhausted, but procedurally barred. Coleman, 501 U.S. at 731–32.

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. Lucas v. O'Dea, 179 F.3d 412, 418 (6th Cir. 1999) (citing Coleman, 501 U.S. at 754). "'[C]ause' under the cause and prejudice

test must be something external to the petitioner, something that cannot fairly be attributed to him[;] . . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule." Coleman, 501 U.S. at 753 (emphasis in original). Examples of cause include the unavailability of the factual or legal basis for a claim or interference by officials that makes compliance "impracticable." Id. To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." Perkins v. LeCureux, 58 F.3d 214, 219 (6th Cir. 1995) (quoting United States v. Frady, 456 U.S. 152, 170 (1982)); see also Ambrose v. Booker, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." Simpson v. Jones, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. Dretke v. Haley, 541 U.S. 386, 392 (2004) (citing Murray v. Carrier, 477 U.S. 478, 495–96 (1986)); accord Lundgren v. Mitchell, 440 F.3d 754, 764 (6th Cir. 2006).

## V.     Analysis

### A.     Denial of Motion to Sever

Petitioner claims that the trial court erred in denying his motion to sever his trial from that of his co-defendants. He alleges that "[a]ll of the evidence was pointing to the co-defendants who were all willing to testify on [his] behalf" if they could do so without incriminating themselves,

and that "Mr. Mathis would testify as to why Mr. Evans was present at the scene of the incident and had no involvement in the crime." (Doc. No. 1 at 4.)

Respondent argues that this claim is not cognizable on federal habeas review, as it asserts an error of state law rather than a violation of federal constitutional rights. (Doc. No. 8 at 14.) Alternatively, Respondent argues that if the claim can be construed as relying upon the denial of a constitutional right, it should be denied as procedurally defaulted because it was not presented to the state courts on that basis. (Id. at 15.)

Liberally construing the pro se petition, the Court finds that this claim asserts a violation of Petitioner's federal rights, rather than merely asserting a state law violation, insofar as it asserts an erroneous failure to sever that deprived him of fundamental fairness in the proceedings against him. Although severance of criminal prosecutions is indeed governed by Tennessee law, an erroneous failure by the trial court to sever the cases of two defendants may warrant federal habeas relief if the error "rises to the level of depriving the defendant of fundamental fairness in the trial process." Hutchison v. Bell, 303 F.3d 720, 731 (6th Cir. 2002) (quoting Serra v. Michigan Dep't of Corr., 4 F.3d 1348, 1354 (6th Cir. 1993)).

Fundamental fairness is "the touchstone of due process." Bearden v. Georgia, 461 U.S. 660, 666 n.7 (1983) (quoting Gagnon v. Scarpelli, 411 U.S. 778, 790 (1972)); see also United States v. Lane, 474 U.S. 438, 446 n.8 (1986) ("[M]isjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."). While the U.S. Supreme Court has held that the joinder of defendants who present "mutually antagonistic defenses [is] not prejudicial per se," it has suggested that prejudice threatening fundamental fairness may be found when "essential exculpatory evidence that would be available to a defendant tried alone [is] unavailable in a joint

trial." <u>Zafiro v. United States</u>, 506 U.S. 534, 538–39 (1993); <u>see</u> <u>Hutchison</u>, 303 F.3d at 731–32.

Therefore, to the extent that Petitioner claims in this Court that the unavailability of Mathis's

testimony deprived him of his federal due process right to a fundamentally fair trial, he has asserted

a cognizable habeas claim.

However, Petitioner did not present this claim in this way to the state courts. In his brief to

the Tennessee Court of Criminal Appeals on direct appeal, Petitioner asserted that the state-law

standard for severance of defendants was met in his case—he presented the proposed testimony of

his co-defendant Mr. Mathis, demonstrated that it was exculpatory, and showed that Mr. Mathis

would testify at his trial if the cases were severed—and that the trial court therefore abused its

discretion in denying his severance motion when it should have deemed severance appropriate

under Tennessee Rule of Criminal Procedure 14(c)(2)(A). (Doc. No. 7-11 at 11–12) (citing, <u>e.g.</u>,

<u>State v. Ash</u>, 729 S. W. 2d 275, 279 (Tenn. Crim. App. 1987)).[1] In ruling on this issue, the

Tennessee Court of Criminal Appeals relied on its decision in <u>Ash</u>, 729 S.W.2d at 279, where it

had found that the trial court did not abuse its discretion in refusing to sever "when the defendant

claims that a co-defendant would have given exculpatory testimony at a separate trial but the co-

defendant invoked the Fifth Amendment at a joint trial." <u>State v. Mathis</u>, 2013 WL 4774130, at

*7. The court additionally observed that in Petitioner's case, the jury heard other exculpatory

evidence concerning his level of involvement with the crimes, as "co-defendant Sams testified on

Defendant Evans's behalf at trial that Defendant Evans was not involved in the planning of the

robbery." <u>Id.</u>; (<u>see</u> Doc. No. 7-6 at 5.)

---

[1]    Petitioner noted in his appellate brief that Tennessee courts apply a legal standard that is similar to that applied by the Sixth Circuit in <u>United States v. Causey</u>, 834 F.2d 1277, 1287 (6th Cir. 1987). (Doc. No. 7-11 at 11.) However, his argument relied entirely upon state law to demonstrate that the state severance standard was met in his case.

In order to have properly exhausted a habeas claim, the substance of the claim must have been presented to the state courts as a federal constitutional claim. Gray v. Netherland, 518 U.S. 152, 162–63 (1996). "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." Anderson v. Harless, 459 U.S. 4, 6 (1982) (citations omitted).

Here, Petitioner presented the severance claim to the Tennessee Court of Criminal Appeals upon a theory that the trial court abused its discretion under Tennessee Rule of Criminal Procedure 14, which requires severance where "appropriate to promote a fair determination of the guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2)(A). Although this state procedural rule grounds the severance determination in the need for "a fair determination," Petitioner's claim before the state courts was, at best, a state-law claim that was "somewhat similar" to his claim before this Court, which is construed as implicating concerns of fundamental fairness and federal due process. Anderson, supra.

Because Petitioner failed to present the substance of this claim to the Tennessee Court of Criminal Appeals as a federal constitutional claim and is barred from doing so now, Respondent correctly argues that the claim has been procedurally defaulted. Gray, 518 U.S. at 161–63; Landrum v. Mitchell, 625 F.3d 905, 918 (6th Cir. 2010). Petitioner does not allege any basis for finding cause excusing this default.[2] The Court is therefore barred from further consideration of this claim. Coleman, 501 U.S. at 750.

---

[2]     In his reply, Petitioner points to his trial counsel's failure to include a transcript of the severance hearing in the appellate record as the reason why the Tennessee Court of Criminal Appeals deemed the issue waived. (Doc. No. 9 at 3.) However, this failure of trial counsel does not relate to the default here, which results from the presentation of the issue to the Tennessee Court of Criminal Appeals under state procedural law rather than federal constitutional law. In any event, that court merely noted that the state had argued for waiver; its ruling was based on the merits of the claim to trial court error, as described above. Mathis, 2013 WL 4774130, at *7.

Even if cause excusing the procedural default had been shown, Petitioner cannot demonstrate actual prejudice resulting from his joint trial with Mr. Mathis. As the Tennessee Court of Criminal Appeals observed, although Mathis declared at sentencing (and presumably would have testified) that "he brought [Petitioner] into the crime without [Petitioner] knowing exactly what would happen," co-defendant Sams testified before the jury that Petitioner was not involved in the planning of the robbery and this fact was found insufficient to undermine his convictions in light of the evidence at trial. Mathis, 2013 WL 4774130, at *7, 12.

Furthermore, the lack of prejudice to Petitioner is evidenced by Mathis's testimony at the post-conviction hearing, which plainly lacked credibility based on its internal inconsistency and its inconsistency with other testimony and the physical evidence, i.e., Mathis's testimony that he had the supplies for the crimes at home the night before the crimes were committed and might have purchased them before Petitioner arrived, versus the receipt for their purchase at 3:09 a.m. the morning of the crimes; his initial testimony that Petitioner voluntarily entered the home, versus his subsequent testimony that he forced Petitioner at gunpoint to don his disguise and enter the home; and his testimony that he had both guns and Petitioner had none, versus the testimony of both victims that Petitioner brandished a gun, Petitioner's own testimony that he initially told the arresting officers he did not possess a gun but then changed his story, and the evidence that Petitioner threw the gun down while fleeing. Such inconsistencies, combined with the sheer improbability that Petitioner, according to his testimony, would have remained friends with a man who forced him at gunpoint to commit these crimes, demonstrate that the denial of Petitioner's severance motion did not "work[] to his actual and substantial disadvantage" so as to constitute prejudice. Perkins, 58 F.3d at 219.

## B.    Sufficiency of the Evidence

Petitioner next claims that the jury's verdict was against the weight of the evidence. (Doc. No. 1 at 5.) He states that, "[o]ther than his mere presence, there was no evidence to link Mr. Evans to the commission of this crime. Victims testified that one man was in charge and the other one just stood there. The man in charge was later identified as Mr. Mathis. All other defendants claim they didn't know Mr. Evans, other than Mathis, and all claim Mr. Evans was not involved in the planning or preparation of the crime." (Id.) Petitioner exhausted this claim before the state court on direct appeal, where he argued that "there was no reliable evidence presented at trial to definitively identify [him] as having been sufficiently involved in the machinations of the crimes . . . to sustain verdicts of guilty on all counts," and that there was no evidence to show that he was "involved in the planning of the offenses" or that he was "in charge" at the time the offenses took place. Mathis, 2013 WL 4774130, at *10.

As noted by the Tennessee Court of Criminal Appeals in addressing this claim, the governing standard when the sufficiency of the evidence supporting a conviction is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The Supreme Court has "made clear that Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." Coleman v. Johnson, 566 U.S. 650, 651 (2012). First, because it is the responsibility of the jury, not the court, to decide what conclusions should be drawn from the evidence, the reviewing state court on direct appeal "may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Id. (quoting Cavazos v. Smith, 132 S. Ct. 2, 4 (2011)). Second, a federal habeas court "may not

overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court," but may only do so if the state court's decision was objectively unreasonable. Id.

Here, the Tennessee Court of Criminal Appeals concluded that the evidence was sufficient for the jury to find Petitioner guilty as charged:

> Aggravated burglary is defined as entering into a habitation without the effective consent of the owner with the intent to commit a felony, theft, or assault. Tenn. Code Ann. §§ 39-14-401, -402, -403. Aggravated robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" when accomplished with a deadly weapon. Tenn. Code Ann. §§ 39-13-401, -402. Theft of property occurs when a person, "with intent to deprive the owner of property, . . . knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a). Especially aggravated kidnapping is defined as the knowing and unlawful removal or confinement of another "so as to interfere substantially with the other's liberty" and accomplished with a deadly weapon. Tenn. Code Ann. §§ 39-13-302, -305.

> Based upon the evidence presented at trial, we conclude that the evidence was sufficient to sustain the Defendants convictions for all of the charged offenses. The Defendants both entered Mr. Becker's home without his consent, each with a loaded gun and wearing a dark hooded sweatshirt, a wig, sunglasses, a bandana, and plastic gloves. This evidence was sufficient for the jury to conclude that the Defendants entered Mr. Becker's home with the intent to commit a felony, theft, or assault. The Defendants took Mr. Becker's checks, money, and debit card using their guns and while threatening to kill Mr. Becker and Ms. Lewis. As previously discussed, after the aggravated robbery was completed, the Defendants continued to confine Mr. Becker using their guns to threaten Mr. Becker's life.

> With respect to Ms. Lewis, the Defendants argue that she could not have been kidnapped because they released her to go to the bank to cash one of the stolen checks. However, especially aggravated kidnapping encompasses not only unlawful confinement but also unlawful removal. After the Defendants had taken possession of Mr. Becker's money, debit card, and checks, Ms. Lewis was forced to leave the house and go to the bank because she was told by the Defendants that Mr. Becker would be killed if she did not return in thirty minutes with the proceeds from the forged check. Additionally, the Defendants did not send Ms. Lewis to the bank alone. Instead, they sent her with co-defendant Turner who, unbeknownst to Ms. Lewis, was involved in the robbery plot and instrumental in its planning.

> Defendant Evans argues that the evidence was insufficient to sustain his convictions because he was not involved in the planning of the offenses and because he did not

physically take Mr. Becker's checks, money, and debit card. Defendant Evans argues that he was unaware "that a robbery was going to take place until it was too late." However, the fact that Defendant Evans entered Mr. Becker's house armed and disguised was more than sufficient circumstantial evidence for the jury to conclude that Defendant Evans was a full participant in the offenses.

The fact that Defendant Evans did not participate in the planning of the offenses does not make the evidence insufficient to sustain his convictions. A person is criminally responsible for an offense committed by another when "[a]cting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2). Defendant Evans's actions aided Defendant Mathis in the completion of all of the offenses, and co-defendant Sams testified that Defendant Mathis's "partner" was to receive $6,000 as his share of the proceeds from the robbery.

Mathis, 2013 WL 4774130, at *11–12.

Viewing these findings through the lens of AEDPA, it is clear that the Tennessee Court of Criminal Appeals correctly applied Jackson and reached a conclusion that was reasonable in light of the evidence presented at Petitioner's trial. Specifically, the court reasonably concluded that, regardless of Petitioner's involvement (or lack thereof) in planning the offenses, there was sufficient evidence for a rational juror to find that he willingly aided Mathis in carrying out the planned offenses, including evidence that he entered Mr. Becker's home along with Mathis, holding a loaded gun and wearing a dark hooded sweatshirt, a wig, sunglasses, a bandana, and plastic gloves, and that he acted without ever dissenting from the plan's execution in the presence of the victims. Mr. Becker testified that, during the encounter in his home, both of the intruders were wearing dark clothes including hooded sweatshirts with the hoods up, and both were disguised and carried handguns. (Doc. No. 7-4 at 31–33). He further testified that one intruder pointed his gun at Mr. Becker while the other restrained him with duct tape. (Id. at 35–38.) When police arrived, Petitioner and Mathis fled in different directions, and handguns and other incriminating implements were subsequently found to have been discarded along the path each

fled. (Doc. No. 7-3 at 63–66, 111–126.) Hair from the wig was also observed on Petitioner's head and neck. (Id. at 75.)

Given the evidence and testimony presented, a rational juror could find that Petitioner was guilty of the charged offenses. The state court's determination that the evidence was sufficient to support a finding that he was a full participant in the crimes, regardless of his role in their planning, was certainly not "objectively unreasonable," and Petitioner has not met the high bar to overcome that determination in a federal habeas proceeding. See Coleman, 132 S. Ct. at 2062; see also Quintero v. Carpenter, 2014 WL 7139987, at *33 (M.D. Tenn. Dec. 12, 2014) ("[E]ven were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable."). Petitioner is not entitled to relief on this claim.

## C.  Sentencing Issues

Petitioner claims that at his sentencing the trial court "applied an improper enhancement factor, placed undue weight on the remaining enhancement factors and erred by concluding there were no mitigating factors." (Doc. No. 1 at 6–7.) This claim of error in the application of the state sentencing scheme is not cognizable on federal habeas review. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010) (reversing circuit court decision requiring state trial court to reconsider sentencing determination in compliance with state law). "[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts." Wilson, 562 U.S. at 5 (emphasis in original). The Supreme Court "ha[s] repeatedly held that 'federal habeas corpus relief does not lie for errors of state law,'" and has admonished that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Id. (quoting Estelle v. McGuire, 502 U.S. 62, 67–68 (1991)). This Court found habeas relief

unavailable in the sentencing context in <u>Villasana v. Steward</u>, No. 3:13-cv-00596, 2014 WL 1883938 (M.D. Tenn. May 12, 2014), where it dismissed as noncognizable the petitioner's claim that the state court sentenced him unlawfully because it misapplied an enhancement factor, wrongfully considered other enhancement factors, and failed to give sufficient weight to mitigating factors. <u>Id.</u> at *8–9. The claim in <u>Villasana</u> is indistinguishable from Petitioner's claim of sentencing error here, and the same result obtains. Petitioner is not entitled to relief on this claim.

### D. Denial of Trial Counsel's Motion to Withdraw

Petitioner claims that the trial court erred in denying counsel's motion to withdraw from the representation. Respondent contends that this claim is procedurally defaulted because Petitioner did not raise it before the state court on direct appeal.

"If the petition[er] fails to raise a claim on appeal, in violation of a state procedural rule, that claim is subject to procedural default and will not be reviewed by federal courts unless the petitioner demonstrates cause and prejudice for his default." <u>West v. Carpenter</u>, 790 F.3d 693, 697 (6th Cir. 2015). There is no question that Petitioner failed to raise on appeal his claim concerning the denial of counsel's motion to withdraw. (<u>See</u> Doc. No. 7-11 at 4.) In his reply, Petitioner argues that his counsel's ineffectiveness on direct appeal caused the default of this issue. (Doc. No. 9 at 2–3.) He further alleges that this claim was included in his post-conviction petition, though it was "improperly entered into the wrong section" of that petition. (<u>Id.</u> at 2.)

While constitutionally ineffective assistance of appellate counsel may constitute cause for a procedural default, it may only do so if the claim of ineffective assistance of appellate counsel was itself exhausted on post-conviction review. <u>Williams v. Lazaroff</u>, 648 F. App'x 548, 553 (6th Cir. 2016) ("[A] petitioner is required to exhaust his cause ground in state court. Accordingly, Williams was required to bring in state court his claim of ineffective assistance of appellate counsel

for failing to advise Williams during his direct appeal of the deadline for state post-conviction proceedings.") (citing Edwards v. Carpenter, 529 U.S. 446, 452 (2000)). Petitioner did not claim in post-conviction that his appellate counsel was ineffective for failing to raise the issue of trial court error in denying his motion to withdraw; he asserted only that counsel "was ineffective on appeal by not timely raising all issues in a motion for new trial, and by not including necessary transcripts in the appellate record." (Doc. No. 7-17 at 64; see id. at 83–84.) Therefore, Petitioner cannot demonstrate cause for his procedural default of this claim.

Nor can Petitioner avoid the default by arguing that he pursued the claim of erroneous denial of the motion to withdraw in post-conviction proceedings. While Petitioner's amended post-conviction petition claims that "[t]rial counsel was ineffective pre-trial by failing to . . . present motions timely and adequately," including "a motion for new counsel to be appointed to Petitioner" (Doc. No. 7-17 at 57–58), it does not claim that the trial court erred in denying counsel's motion to withdraw. Although Petitioner alleges in his petition before this Court that his post-conviction counsel was ineffective for failing "to preserve and present" any grounds not asserted before the post-conviction court (Doc. No. 1 at 9), the ineffective assistance of post-conviction counsel can only demonstrate cause excusing the procedural default of a claim of ineffective assistance of trial counsel, not a claim of trial court error. West, 790 F.3d at 697.

Even if Petitioner could establish cause for the default, the Court finds that he cannot demonstrate prejudice resulting from the denial of any constitutional right in this instance. The accused's right to choose counsel to assist in his defense "is an essential component of the sixth amendment right to assistance of counsel." Wilson v. Mintzes, 761 F.2d 275, 280 (6th Cir. 1985). However, the unconstitutional denial of a defendant's choice of counsel refers to the deprivation of "the accused's right to retain counsel of his choice," i.e., the right "to select his own counsel at

his own expense." Id. at 279 (citing Linton v. Perini, 656 F.2d 207, 208–09 (6th Cir. 1981)). This right to choose counsel, while not absolute, must be afforded "an accused who desires to and is financially able" to do so. Id. at 278–80.

Even in the absence of financial ability to retain substitute counsel, the right to choose counsel "is implicated whenever a defendant informs the court that his current counsel is not his counsel of choice or that he is unhappy with his counsel." Cottenham v. Jamrog, 248 F. App'x 625, 636 (6th Cir. 2007) (citing United States v. Iles, 906 F.2d 1122, 1130 (6th Cir. 1990); Wilson, 761 F.2d at 281 n. 10). Although "[a]n indigent defendant has no right to have a particular attorney represent him," "[i]t is hornbook law that when an indigent defendant makes a timely and good faith motion requesting that appointed counsel be discharged and new counsel appointed, the trial court clearly has a responsibility to determine the reasons for defendant's dissatisfaction with his current counsel." Iles, 906 F.2d at 1130 (quoting LaFave and Israel, Criminal Procedure, § 11.4 at 36 (1984)) (internal quotation marks omitted). To this end, the "court usually must engage a defendant in person where he has expressed dissatisfaction with counsel and has sought to have him removed." Id. at 1131. See also Linton v. Perini, 656 F.2d 207, 211–12 (6th Cir. 1981) (holding that a defendant's right to counsel was violated by the court's summary denial of motion for substitution).

Here, counsel's motion to withdraw, filed August 27, 2010, was denied by the trial court after a hearing on September 17, 2010, with instructions that the trial remain set for November 1, 2010. (Doc. No. 7-1 at 32–34.) There is no indication that the motion to withdraw was rejected summarily, and Petitioner has not otherwise demonstrated that its denial amounted to constitutional error which "worked to his actual and substantial disadvantage," so as to excuse his

default on this claim of trial court error. <u>Perkins</u>, 58 F.3d at 219. Petitioner is not entitled to relief on this claim.

E.     **No Certificate of Appealability Shall Issue**

When the district court denies a ground for relief on the merits in a habeas corpus action, a certificate of appealability (COA) "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the standard being whether "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000). Because Petitioner has not made a substantial showing of the denial of a constitutional right with respect to any ground for relief asserted in the petition, a COA will not issue.

VI.     **Conclusion**

For the foregoing reasons, the habeas corpus petition will be denied and this matter will be dismissed with prejudice.

An appropriate Order is filed herewith.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE